UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:09CV-661-H

TEXAS CAPITAL BANK, N.A., et al.                                              PLAINTIFFS

V.

FIRST AMERICAN TITLE INSURANCE CO., et al.                         DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, Texas Capital Bank, N.A. ("Texas Capital"), Liberty Mutual Insurance Europe Limited trading as Liberty International Underwriters ("Liberty"), and Certain Underwriters at Lloyd's London who are members of Syndicate Nos. 4444, 2003 and 4000 subscribing to Bond No. FA054730g002 ("Lloyd's Underwriters") (collectively "Texas Capital" or "Plaintiffs"), bring this action alleging they sustained $3.2 million in losses after Defendant, First American Title Insurance Company ("First American Title"),[1] wrongly transferred certain mortgage funds they were holding in escrow.

I.

The case actually arises from a massive mortgage fraud scheme conceived and orchestrated through Prajna Group, Inc. d/b/a/ Liberty Mortgage Funding ("Prajna") by one of Prajna's employees, Bounmy Phouthavong, who is now in prison following a guilty plea to

---

[1] First American Title held an account at First American Trust for the purpose of closing mortgage loan transactions. The two companies share offices in Santa Ana, California and are owned by the same parent corporation, First American Corporation. By an earlier order, the Court has dismissed First American Trust as a defendant.

crimes arising from these events. Ms. Phouthavong accomplished her fraud by convincing Texas Capital to approve the funding of mortgage loans which did not actually exist. After Texas Capital approved the loans, it forwarded the mortgage funds to First American Title. Thereafter, Ms. Phouthavong would contact First American Title, claim that the funds had been mistakenly wired to it and that the funds should be redirected to Prajna's account. In each instance, First American Title complied with the request.

The entire chain of events began in March 2008, when Texas Capital entered into a mortgage warehousing agreement with Prajna, a residential mortgage licensee that extended residential mortgage loans to Kentucky consumers. Under this agreement, Texas Capital agreed to fund consumer home mortgage loans which Prajna originated. As compensation, Texas Capital received a participation or ownership of the majority interest in those loans. Texas Capital provided the funds for the Prajna home mortgage loans, with First American Title acting as escrow agent. It then sold the mortgage notes to investors on the secondary mortgage market.

By mid-2008, Texas Capital and Prajna completed at least twenty-nine legitimate mortgage loan transactions. To facilitate the transactions, Prajna obtained the services of First American Title to act as an escrow or closing agent. The transactions would proceed as follows. After receiving and approving financial and deed paperwork from Prajna, Texas Capital would wire the mortgage funds into First American Title's account, with the name of the borrower and a First American-created file number in the reference line of the wire. First American Title would use this file number to locate loan documents which Prajna had provided. At closing First American Title would disperse the mortgage funds to the seller of the real property, the mortgagor of the property would receive the deed, and Texas Capital would receive the mortgage

note.  Texas Capital says that these transactions constituted a contract between itself and First American Title.

Somewhat later in 2008, Prajna told Texas Capital that it would use Venture Title as its closing agent instead of First American Title.  Venture Title was acting as an agent for First American Title in the Louisville market and it was formed by two individuals from First American Title, Chris Mooser and Shawn Freibert.  Venture Title, which was administratively dissolved in June 2009, is not a party to this suit.[2]

The transactions involving the eleven loans at issue in this lawsuit all took place after most of the twenty-nine legitimate loans.  Six of the loans worth $1.9 million are those in which First American Title served as escrow agent and five worth $1.3 million in which Ms. Phouthavong, the Prajna employee, deceived Texas Capital into thinking Venture Title was serving as escrow agent.  The first six transactions occurred between June 27 and July 14, 2008. In each instance, Ms. Phouthavong originated a loan and provided Texas Capital with fraudulent information, causing it to approve the loans and wire the proceeds to First American Title, as was usual practice.  However, for these six transactions, Ms. Phouthavong then informed First American Title that Texas Capital mistakenly wired the funds to them and that a different title company was to close the loan.  In each instance, First American Title forwarded the funds to Prajna upon Ms. Phouthavong's request.

After the last of these six transactions, First American Title declined to make further transfers to Prajna and indicated that future misdirected wires would be returned to the

---

[2] During the time it existed, Venture Title's website contained First American's logo and indicated that Venture Title was First American's "authorized agent." First American Corporation, the parent company for First American Title and First American Trust, listed the Venture Title office as a "branch office."

3

originating bank. The parties dispute the reasons for First American Title's refusal to make further transfers. Regardless, Ms. Phouthavong established a fraudulent bank account at National City Bank under the name of Venture Title. Prajna directed Texas Capital to make future wire transfers to that account. There is no evidence that First American Title had knowledge of the fraudulent Venture Title bank account or knowledge of the Texas Capital transfers to it. Prajna filed for Chapter 7 Bankruptcy in the Western District of Kentucky on August 20, 2008.

With Prajna in bankruptcy and Ms. Phouthavong in prison, Texas Capital brought this action in Jefferson Circuit Court against First American Title and First American Trust for breach of various contractual, statutory, and common law duties. Plaintiffs argue that Defendants are liable for the Venture Title losses because they failed to inform Plaintiffs about Prajna's unusual requests to send the money to it, rather than disburse it to the sellers or return it to Texas Capital. Plaintiffs assert that they never would have made the $1.3 million in transfers to the Venture Title account had they known about Prajna's previous requests. The complaint seeks money damages in the amount of $3,248,056.05, along with attorneys fees and expenses. Defendants removed to this Court.

II.

In an earlier opinion and order, this Court dismissed the case against defendant First American Trust– the bank where First American Title held an account for the transactions at issue in this lawsuit. Now before the Court are cross-motions for summary judgment on Count I, the breach-of-contract cause of action. Parties have also filed cross-motions for summary judgment on claims arising from the wires to the fraudulent Venture Title account at National

City Bank. The Court notes that Texas Capital's losses suffered from the Venture Title wires do not constitute a separate cause of action, but rather present an issue as to the extent of damages, if any, on the breach-of-contract and tort-based claims.

A party may win summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party initially bears the burden of demonstrating that an essential element of the nonmoving party's case is lacking. *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999). The nonmoving party may in response show a genuine dispute exists as to that element and defeat the motion. *Anderson*, 477 U.S. at 248. These same rules apply when addressing cross-motions for summary judgment. *Atlantic Richfield Co. v. Monarch Leasing Co.*, 84 F.3d 204, 206 (6th Cir. 1996).

### III.

Plaintiffs have alleged that the transactions between Texas Capital and First American Title from March to August 2008 created an express or implied contract and that Defendant breached this contract when on six occasions it directed Texas Capital funds to Prajna instead of using the funds to close mortgage loans. Plaintiffs say that the contract made First American Title either the escrow agent or the bailee of Texas Capital. *Id.* at 19-22.[3]

### A.

---

[3] Plaintiffs have also alleged claims sounding in tort based on the same course of conduct, but only the breach-of-contract claim is at issue in these cross-motions for summary judgment.

First American Title argues that no contract existed between the parties. As a general matter, Kentucky law requires three elements for a breach-of-contract claim: (1) a contract between the parties; (2) a breach of that contract; and (3) damages caused by the breach. *Ward v. Daugherty*, 14 S.W.2d 1089, 1089, (Ky. 1929) (quoting *Miles v. Miller*, 12 Bush 134, *3 (Ky. 1876)); *see also Fanin v. Commercial Credit Corp.*, 249 S.W.2d 826, 827 (Ky. 1952). The contract can be express or implied. *See, e.g.*, *Barrick v. James*, 227 S.W. 2d 909, 910-11 (Ky. 1950) (plaintiff may recover on either an express or implied contract and cannot be compelled to elect between the two). An express contract may be written or oral, while an implied contract may be implied in law or in fact. *See Israel's Adm'r v. Rice*, 174 S.W. 2d 517, 518-19 (Ky. 1943) (contract promise can be expressed in writing, orally, in acts, or some combination thereof); and *Sullivan's Adm'r v. Sullivan*, 59 S.W.2d 999, 1001 (Ky. 1933) (recognizing contracts implied in law and in fact).

Defendants argue, and this Court agrees, that the record contains insufficient facts to support finding an express contract. Other than the wire transfers, the Court finds no written agreement nor any sort of communication between the parties during the relevant period. The only information the wires contained, other than the basic account information, was the name of the borrower on the underlying mortgage transaction.[4] This evidence falls far short of establishing an express contract.

B.

In the alternative, Texas Capital argues that its course of dealing with First American Title created an implied contract in the form of a bailment. A bailment consists of:

---

[4] Some of the wires also contained First American file numbers that Ms. Phouthavong apparently fabricated. The numbers did not correspond to any files that First American possessed.

> "the delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it."

*Jones v. Hanna*, 814 S.W. 2d 287, 289 (Ky. Ct. App. 1991) (citing 8 Am. Jur. *Bailments* § 2); *see also*, *Commonwealth v. Polk*, 75 S.W. 2d 761, 764 (Ky. 1934). As with contracts in general, a bailment can be implied in fact or implied in law. An implied-in-fact bailment arises when there is "some form of *understanding between the parties*" and "the acts or conduct of the party sought to be bound" provides a "substantive foundation" for the implied bailment contract. *Adika v. Smith*, 466 F.3d 503, 506 (6th Cir. 2006) (quoting 8A Am. Jur. 2d *Bailments* § 37) (applying Kentucky law).

An implied-in-law, or constructive, bailment may arise "when one person has lawfully acquired possession of another's personal property...and holds it under such circumstances that the law imposes on the recipient of the property the obligation to keep it safely and redeliver it to the owner." 8 C.J.S. *Bailments* § 14. One such circumstance is "when a party engages another to perform some service with respect to that person's personal property, without instructions as to the property's disposition." *Id.* While Kentucky courts have not discussed constructive bailments specifically, at least one court has recognized that a contract is not required to create a bailment. *Mezo v. Warren Cty. Pub. Library*, No. 2009-CA-000631-MR, 2010 WL 323302, at *2 (Ky. Ct. App. 2010) (quoting 8A Am. Jur. 2d *Bailments* §§ 1 and 4). Moreover, Kentucky recognizes implied-in-law contracts generally, of which constructive bailments are a species. *See Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W. 3d 626, 632-33 (Ky. 2005) (implied-in-law contract can be imposed because of conduct of parties or special

7

relationship between them). This Court concludes that Kentucky courts would recognize a constructive bailment based upon a proven course of conduct.

Here, the undisputed facts demonstrate that the relationship between Texas Capital and First American Title constituted such a constructive bailment, if not a bailment implied in fact. First American Title does not dispute that Texas Capital transferred, and it accepted, the funds in the six wires at issue here. Nor does it deny knowing that Texas Capital transmitted the funds for the purpose of closing mortgage transactions. By wiring funds to First American Title's "KY-Louisville Escrow Trust Account" to close mortgages, Texas Capital engaged that company to perform a service with respect to its property, thus creating a bailment. 8 C.J.S. *Bailments* § 14; *see West Knoxville Assoc. Ltd. P'ship v. Ticor Title Ins. Co.*, No. 95-5931, 1997 U.S. App. LEXIS 23942 at *17 n.8 (6th Cir. Sept. 9, 1997) (noting that money delivered to a title company with no terms and conditions "at the bare minimum" created a constructive bailment).

Merely showing a bailment does not entitle Plaintiffs to summary judgment, however. A bailee has a duty to hold the bailed property and either return it to the bailor or dispose of it in accordance to the bailor's instruction. *Harlan State Bank v. Banner Fork Coal Corp.*, 261 S.W. 16, 16 (Ky. 1924). Here, it is undisputed that First American Title did not return the bailed funds to Texas Capital and instead transferred them to an account held by Prajna. Since Prajna was in no way an agent of Texas Capital, this transfer does not appear to have properly discharged First American Title's bailment duties. Thus, the issue of liability on the bailment narrows to whether First American Title properly discharged its duties under the bailment by disposing of the funds according to Texas Capital's instructions.

The nature of the instructions attached to the funds Texas Capital transferred to First

American Title is hotly disputed. Plaintiffs argue that the names of home-buyers listed on the wire transfers constituted instruction that the only authorized use of the funds was to close a particular mortgage transaction; if Defendant could not close on the mortgage, it was not authorized to do anything else with the funds except return them to Texas Capital. They also contend that this arrangement–closing the loan or returning the funds to the warehouse lender–is standard industry practice.

On the other hand, Defendant points out that Prajna's standard closing instructions required a title company to wire all funds only to Prajna, not the warehouse lender, if a mortgage loan did not close. Furthermore, Defendant alleges that Texas Capital had previously approved these Prajna closing instructions at least fifty times.[5] No such instructions are in the record with regard to the loan transactions at issue here, presumably because Ms. Phouthavong did not send any documents to First American Title with regard to the fraudulent loans. Still, the standard Prajna closing instructions, possibly approved by Texas Capital, that funds not used to close mortgages must be wired to Prajna create a genuine dispute as to the terms by which Defendant held Texas Capital's funds in bailment. The disputed terms of the bailment are a material fact, making summary judgment inappropriate.

IV.

The parties have separately briefed the issue of Defendant's liability for Plaintiffs' losses arising from transfers to the fraudulent Venture Title account at National City Bank. Plaintiffs claim that these damages are recoverable under both their contract and negligence claims. Their

---

[5] While the Court cannot verify this claim from the record, Texas Capital possessed examples of these Prajna closing instructions, including one sent to First American Title during the relevant time period. *See* Def. Reply Further Supp. Summ. J., Ex. J at *130.

basic theory is that had Defendant not transferred the bailed funds to Prajna, or at the very least had Defendant informed Texas Capital of Prajna's requests for the transfers, Texas Capital would have ceased doing business with Prajna, thus preventing their subsequent $1.3 million loss. For the reasons discussed below, neither cause of action supports recovery of these damages.

Recovery on a breach of contract may be for general damages or special damages. General damages arise naturally from the breach itself or it can be supposed that the parties had these damages in mind as a probable result of breach. Special damages, on the other hand, arise from special circumstances outside the "usual course of things" and are only recoverable when the party to be held liable had notice of the special circumstances involved. *U.S. Bond & Mortg. Corp. v. Berry*, 61 S.W. 2d 293, 297 (Ky. 1933) (citing *Hadley v. Baxendale*, (1854) 156 Eng. Rep. 145, 9 Ex. Cheq. 341).

Here, the $1.9 million lost from First American Title wiring funds to Prajna would constitute general damages, as they arise directly from the alleged breach of the bailment contract. In contrast, the $1.3 million lost from Texas Capital subsequently wiring money into a fraudulent bank account could only qualify as special damages. Prajna determined to make Venture Title its escrow agent; Texas Capital made no objection. First American Title had no voice in Prajna's change or Texas Capital's acquiescence to it. First American Title had no notice that Texas Capital might rely on their bailment relationship as a means of knowing whether it should continue doing business with Prajna. Ms. Phouthavong's direct defrauding of Texas Capital was too unrelated to the contract between Texas Capital and First American Title to be recoverable as contract damages.

Plaintiffs also allege a negligence claim against Defendant from the same course of

10

conduct as the breach-of-contract claim, and seek recovery of the $1.3 million subsequent loss as part of their damages. A bailment may give rise to a claim for negligence, as the bailee owes a duty of care to the bailor. *Commonwealth v. Polk*, 75 S.W.2d 761, 764 (Ky. 1934); *Bowman v. Vandiver*, 47 S.W. 2d 947, 948 (Ky. 1932). Negligence requires a showing of "consequent injury," which includes the element of "legal causation between the defendant's breach [of duty] and the plaintiff's injury." *Pathways, Inc. v. Hammons*, 113 S.W. 3d 85, 89 (Ky. 2003); *see* 8A Am. Jur. 2d *Bailments* § 119 ("bailee's actions must have been a proximate, direct, and immediate cause of the loss or damage"). Kentucky courts have adopted the "substantial factor" test for causation set forth in the Restatement (Second) of Torts. *Pathways*, 113 S.W. 3d at 91-92. Under this test, the "actor's negligent conduct is a legal cause of harm to another if his conduct is a substantial factor in bringing about the harm." *Id.* at 92. A court may decide whether legal causation exists as a matter of law when the essential facts are undisputed and only one conclusion may be reasonably drawn. *Id.*

Presuming for the moment that Plaintiffs do prove a breach of duty by Defendant, the undisputed facts warrant only one conclusion: such a breach was not the legal cause of the $1.3 million Texas Capital transferred directly into a fraudulent bank account. First American Title's conduct arguably "furnished the occasion of injury." Its decision to not notify Texas Capital about loans not closing and transferring the bailed funds to Prajna denied Texas Capital information that perhaps would have made Texas Capital more cautious about doing business with Prajna. But this causal connection is too attenuated to support a finding of legal causation. *Id.* (citing *Commonwealth, Dep't of Highways v. Graham*, 410 S.W. 2d 619, 620 (Ky. 1966)). Thus, whether Plaintiffs prevail on a breach-of-contract or a tort-based theory of liability, they are

11

not entitled to damages from Defendant for the $1.3 million Texas Capital wired to the fraudulent Venture Title account.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's Motion for Partial Summary Judgment as to Count I is DENIED and Plaintiffs' Motion for Partial Summary Judgment on Count I is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Partial Summary Judgment on Plaintiffs' claims involving the National City Wires is SUSTAINED and all Plaintiffs' claims for those damages are DISMISSED WITH PREJUDICE.

A court trial is currently set for May 15, 2012. The Court will set a conference in the near future.

cc: Counsel of Record