UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**(ELECTRONICALLY FILED)**

| | | |
|---|---|---|
| **TEXAS CAPITAL BANK, N.A., et al.** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No.  3:09-cv-661 JGH** |
| **FIRST AMERICAN TITLE** | ) | |
| **INSURANCE COMPANY** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR
SUMMARY JUDGMENT ON THE
BREACH OF CONTRACT AND CONVERSION CLAIMS**

## I. INTRODUCTION

The plaintiffs ("Texas Capital"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully submit their renewed motion for summary judgment (the "Motion") on the breach of contract and conversion claims set forth in Counts I and VIII of the second amended complaint, respectively (D.I. 104) (the "Complaint).  First American Title Insurance Company ("First American") failed, at least six different times, to perform its primary function in loan transactions—distributing other people's money correctly.  Here, First American received money from Texas Capital for six specifically designated loan closings for which First American had no file and no closing scheduled.  First American's own written policies and guidelines, which First American produced to Texas Capital less than a month ago after improperly concealing them for over a year, require that when receiving a mistaken wire transfer of funds,

i

First American's employees should (1) obtain a written request for disbursement, (2) contact its regional banking department by phone and email the day the wire is received and (3) return the funds to the bank they came from.  However, rather than follow First American's policies, an untrained First American employee, JoAnn Embry, instead sent the funds to a *different* bank account at a *different* bank, at the request of one of her customers, whom Ms. Embry liked and trusted.  When Ms. Embry went on vacation and the same unusual request was made to a different employee, that employee brought it to the attention of management, which decided that it would not comply with future such requests from the customer (Prajna).

Based on the facts described above, the Court has ruled that a bailment contract existed between Texas Capital Bank and First American and that, pursuant to that contract, First American had an obligation to either (1) return the wired funds to Texas Capital Bank or (2) disburse the funds in accordance with Texas Capital Bank's instructions.  *See Tex. Capital Bank, N.A.*, 2011 U.S. Dist. LEXIS 109672, at *13 ("A bailee has a duty to hold the bailed property and either return it to the bailor or dispose of it in accordance to the bailor's instruction.").  The Court concluded, however, that a question of fact existed as to whether First American actually followed Texas Capital Bank, N.A.'s ("Texas Capital Bank") instruction when it forwarded the funds to Prajna.  Additional facts have now been adduced in discovery—including the long-concealed First American policies for the handling of other parties' money.  The case is ripe for summary judgment on Texas Capital's breach of contract and conversion claims.   It is undisputed that First American did not follow Texas Capital Bank's instructions with respect to the wired funds.  First American has repeatedly stated that it followed Prajna's instructions, not Texas Capital Bank's.  Had First American followed either Texas Capital's instructions *or its own policies*, it would not have inadvertently aided Prajna in completing its fraud.

ii

Texas Capital is seeking summary judgment as to the entire $1.9 million that First American mistakenly distributed to Prajna. The Court's granting of this motion would eliminate the need for Texas Capital's pending claims in its second amended complaint to proceed to trial scheduled to begin on May 15, 2012.[1] Texas Capital states the following in further support of this Motion.

---

[1] Texas Capital intends to move for sanctions against First American (not its counsel) for its unjustified concealment of the wire and escrow account guidelines and policies. The Court did not have the benefit of reviewing these policies and guidelines when it rendered its earlier opinion and order (D.I. 83), because First American was concealing those documents from the Court and Texas Capital at the time. Thus, the appropriate remedy is to set aside the summary judgment First American received on the $1.3 million lost through the fraudulent Venture Title Group bank account, which was obtained during the time in which First American continued to deny the existence of the guidelines. With the claim for the additional $1.3 million reinstated, summary judgment on the $1.9 million will leave for trial the issue of the additional $1.3 million in damages.

First American has filed a motion to reconsider the Court's prior order prohibiting apportionment to Bounmy Phouthavong or in the alternative to certify the issue to the Kentucky Supreme Court. Because apportionment is not applicable to breach of contract claims, granting summary judgment on Count I will moot that motion. *See Ky. Farm Bureau Mutual Ins. Co. v. Ryan*, 177 S.W.3d 797, 800 (Ky. 2005) (rejecting argument that Kentucky's apportionment rules apply to a contract claim, even if it "sounds in tort.").

iii

## II.  TABLE OF POINTS AND AUTHORITIES

I.  **INTRODUCTION** ..................................................................................... i

       *Tex. Capital Bank, N.A., 2011 U.S. Dist. LEXIS 109672* ......................... ii

       *Ky. Farm Bureau Mutual Ins. Co. v. Ryan*, 177 S.W.3d 797
       (Ky. 2005) .................................................................................. iii

II.  **TABLE OF POINTS AND AUTHORITIES** ........................................ iv

III. **FACTUAL BACKGROUND** ...................................................................1

   **A.**   **First American's Policies And Guidelines For Handling Of
       Funds Deposited Into Its Escrow Accounts** ......................................1

   **B.**   **The First American Louisville Office And The Services It Provided** .......2

   **C.**   **The Training Of The First American Louisville Office Employees** .........4

   **D.**   **The Agreement Between Texas Capital Bank, N.A. And Prajna Group, Inc.** .........6

   **E.**   **The 2008 Transactions Involving Texas Capital Bank,
       First American, And Prajna** ...........................................................8

       ***(1) Charles Kerekes and Kenneth Dunn – June 27, 2008*** ..................9

       ***(2) Ronald Neff – July 3, 2008*** ...................................................11

       ***(3) Glenn MacPherson – July 10, 2008*** ........................................11

       ***(4) Tom Triolo – July 11, 2008*** ...................................................12

       ***(5) Angel Garcia and Bonnie Yarbrough – July 14, 2008*** ...............13

   **F.**  **JoAnn Embry and Lisa Smith's Suspicions** ....................................15

IV. **PROCEDURAL BACKGROUND** ........................................................16

       *Tex. Capital Bank, N.A., 2011 U.S. Dist. LEXIS 109672* .............16, 17

V. **ARGUMENT AND AUTHORITY** .......................................................17

       *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp,*
       475 U.S. 574, 587-88 (1986) .......................................................17

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ................................17

**A. First American Breached The Bailment Contract By Not Complying With Texas Capital's Instructions When First American Forwarded The Wired Funds To Prajna**................................................................................................17

    **(1) First American Has Consistently Asserted That It Did Not Follow And Was Not Required To Follow Texas Capital Bank's Instructions**................................................................................18

    **(2) First American In Fact Did Not Follow Texas Capital's Instructions** ..21

        **(a) The Information Included With The Wire Transfers Is The Only Possible Source Of Instructions From Texas Capital**.21

        **(b) Ms. Phouthavong's Requests Were Not Instructions From Texas Capital Bank**..................................................25

        *Tex. Capital Bank, N.A.*, 2011 U.S. Dist. LEXIS 109672 .......................25

        **(c) Closing Instructions From Prior Loan Transactions Were Not Instructions From Texas Capital Bank Regarding The Six Transfers At Issue Here—First American Did Not Consult The Documents And Did Not Follow Them.** ....................25

        **(d) First American's Transfers Of Texas Capital Bank's Money To Prajna Were Purely Based On Pure Training, Expediency, And Convenience To First American, Not An Understanding Of Its Legal Obligations.** ..................................................30

    **(3) First American Did Not And Cannot Rely On A Course Of Dealing With Texas Capital Bank To Justify Sending The Funds To Prajna**..................................................31

        Williston on Contracts §§ 34.1, 34.14 ................................32

        Restatement of Contracts (Second) §§ 220(1), 222(1) ............................32

        *Tex. Capital Bank, N.A.*, 2011 U.S. Dist. LEXIS 109672 .......................33

**B. First American Is Also Liable To Texas Capital Bank For Converting The Wired Funds**................................................................................34

**VI.  CONCLUSION** ...................................................................................................................35

# III.  FACTUAL BACKGROUND[2]

## A.  First American's Policies And Guidelines For Handling Of Funds Deposited Into Its Escrow Accounts

First American, the largest title company in the United States, is a sophisticated organization with hundreds of offices and agents across the country.  First American had very detailed policies and guidelines in place for handling escrow funds in 2008.  These guidelines provided that, among many other things, mistaken wires are to be handled in a very specific manner:

> ### WIRES RECEIVED IN ERROR
>
> When a bank sends a wire in error you must notify Regional Banking Department by phone and email ON THE SAME DAY THE WIRE IS RECEIVED and give them your bank name and account number, the amount of the wire and the date received. FAILURE TO RETURN A WIRE RECEIVED IN ERROR IN A TIMELY MANNER MAY RESULT IN ADDITIONAL FEES BEING CHARGED TO THE BRANCH.[3]

These instructions are in capital letters and underscored in the policy itself.  Another First American manual provides exactly the same policy.[4]  Yet another First American manual provides the following:

> ### INCOMING WIRE REJECTION OR RETURN TO SENDER
>
> Each incoming wire must be receipted daily.  However, there are times when an incoming wire is to be rejected/returned for various

---

[2] In an effort to avoid inundating the Court with an excessive number of deposition transcript pages, Texas Capital has attached only portions of the deposition transcripts referenced in this brief.  If the Court requests, Texas Capital will file as a supplement to this brief the full transcript of any and all depositions the Court would like to review.

[3] Condensed Banking & Escrow Manual, FATIC 012025 through 012045, at page 7 (emphasis in original), attached and incorporated here as **Exhibit 1**.

[4] Escrow Accounting Manual Utilizing Fast And Trust 32, FATIC 011911 through FATIC 012024 ("Escrow Accounting Manual"), at page 29, attached and incorporated here as **Exhibit 2**.

1

> reasons (i.e., file not closing, file cancelled, closing delayed, etc.).
> To reject or return as [sic] wire, follow these steps:
>
> a.  Paste a copy of the *incoming wire* from iBanking into the body
> of your email.
>
> b. Indicate the reason for the rejection or return in the body of your
> email.
>
> c.  In the subject line, please use the following verbiage:
> "Reject/Return Wire."
>
> d.  Email the request to wires.az@firstam.com.[5]

It may be stating the obvious, but this policy makes clear that when First American is to "return" a wire, it is to send it back to where it came from (i.e., the sender on the incoming wire information.

## B.   The First American Louisville Office And The Services It Provided

The 2008 wire transactions at issue in this case involved the First American office located in Louisville, Kentucky (the "First American Louisville Office").  The First American Louisville Office provided real estate loan settlement services in 2008.  The services included property title searches, issuing title insurance, arranging for the closing of a loan transaction, obtaining signatures for loan documents, and, of course, holding and disbursing loan proceeds appropriately.[6]  First American understood that its appropriate handling of the loan proceeds was the most important component of its service—the component that exposes the party putting new

---

[5] National Trust Accounting Policies And Procedures, FATIC 012046 through 012051, at page 4 (emphasis supplied), attached and incorporated here as **Exhibit 3**.

[6] *See* February 13, 2012 Deposition of First American's Rule 30(b)(6) witness, Chris Mooser, ("Mooser 30(b)(6) Deposition") at 171-177 (describing services First American provided for the legitimate loan transactions). Copies of the portions of the Mooser 30(b)(6) Deposition referenced in this brief are attached and incorporated here as **Exhibit 4**.

money on the table to the most risk.  First American's written escrow guidelines make clear that

it holds funds in its escrow accounts in a *fiduciary capacity*:

> The escrow/trust account holders have fiduciary responsibility for prudent processing, safeguarding, and accounting for funds entrusted to them by escrow customers of clients.  Accordingly, this responsibility results in significant exposure to losses from inadvertent or intentional failure to execute their duties properly. . . .   Custody of closing or case funds is a fiduciary function.[7]

> The handling of closing funds involves a Fiduciary responsibility. Agent has a <u>duty</u> to ensure the funds entrusted to them are disbursed properly.  They must ensure, to the best of their ability, that all funds are received by the appropriate party.[8]

First American educational materials presented just before its mishandling of Texas

Capital's money make clear that in meeting its fiduciary responsibilities for funds deposited into

its escrow accounts, it must be diligent in detecting fraudulent schemes:

> Who is really responsible for fraud?  YOU! Or, the owner of the account.  Although the money held in the escrow account isn't yours, either you or the bank is responsible if a shortage occurs.[9]

> Not all crooks are shady, unknown characaters….don't forget about your own employees![10]

---

[7] Escrow Guidelines For The First American Family Of Companies And Agencies, FATIC 10761 through FATIC 10763, attached and incorporated here as **Exhibit 5**.

[8] First American Presents the 2006 Title Insurance Seminar, June 14, 2006, Louisville, Kentucky, FATIC 11002 through 11249 (emphasis in original).  The quoted language appears at FATIC 11214 in the seminar section titled "How Does The Title Attorney Perform Proper Escrow Account Reconciliation?," and presented by Susan Taulbee, Regional Audit Director for First American.  The title page, agenda, and Ms. Taulbee's section materials are attached and incorporated here as **Exhibit 6** (the "Taulbee CLE").  The seminars are designed to assist First American agents and their staff in understanding First American's policies and procedures.  *See* January 19, 2012 deposition of First American's Rule 30(b)(6) witness, Tom Campbell ("Campbell 30(b)(6) Deposition") at 102. Copies of the portions of the Campbell 30(b)(6) Deposition referenced in this brief are attached and incorporated here as **Exhibit 7**.

[9] Taulbee CLE, at FATIC 11200 (attached at Exhibit 6).

[10] Taulbee CLE, at FATIC 11199 (attached at Exhibit 6).

> Identity theft and mortgage fraud is rife. . . .  Turning a blind eye to someone you know is attempting to defraud a lender is clearly unethical. . . .  As a title agent, you have ethical and legal duties to all parties to the transaction . . . .[11]

The last paragraph of the above quote is from a CLE presented by First American in Louisville on June 25, 2008, *only two days* before the first of the fraudulent loans at issue in this case.  Thus, First American was well aware of the potential for fraudulent loss of funds in its escrow accounts and understood that it would be responsible for funds mistakenly paid to the wrong party.

**C.**  **The Training Of The First American Louisville Office Employees**

The managers of the First American Louisville Office, attorneys Chris Mooser and Shawn Freibert, operated a title company called Mooser & Freibert Land Title Company, LLC ("Mooser & Freibert") in the same location before it was acquired by First American in 2005.[12] Many of the Mooser & Freibert employees, including JoAnn Embry (the First American employee who directed most of the wires at issue), were Mooser & Freibert employees, who continued working with Chris Mooser and Shawn Freibert as First American employees.[13]  As part of the transition from Mooser & Freibert to First American, First American offered limited training to the First American Louisville Office employees.  First American's witnesses testified

---

[11] First American Presents the 2008 Title Insurance Seminar, June 25, 2008, Louisville, Kentucky, FATIC 11362 through 11451.  The quoted language appears at FATIC 11406 in the seminar section titled "'Food for Thought' Ethically Dealing with Problem Closings, People and Facts," and presented by Sue Dutcher of First American.  The title page, agenda, and Ms. Dutcher's section materials are attached and incorporated here as **Exhibit 8**.

[12] See Letter Agreement between First American and Mooser & Freibert, FATIC 10466 through 10484, attached and incorporated here as **Exhibit 9**.

[13]  *See* January 25, 2011 deposition of First American's former employee, JoAnn Embry ("Embry Deposition") at 19 (stating she worked for Mr. Mooser and Mr. Freibert from 2001 to 2009).  Copies of the portions of the Embry Deposition referenced in this brief are attached and incorporated here as **Exhibit 10**.

that the training in 2005 focused on the change to First American's paperless filing system, the FAST system.[14]

Although First American's policies, guidelines and other training materials were easily accessible to the First American Louisville employees on their desktop computers, the employees were never required or even encouraged to look at them, and apparently were not aware of their substance.[15] Indeed, Chris Mooser, a First American Rule 30(b)(6) witness, testified that neither he, Mr. Freibert, nor any other First American management gave the First American Louisville Office employees any training on First American's policies and guidelines, including those for handling funds in First American's escrow accounts.[16] Instead, the employees were left to draw on their own experience, receive "on-the-job training," and watch other employees.[17]

Thus, while First American had policies and guidelines with respect to the handling of funds in the escrow account, the First American Louisville office was oblivious to them. First

---

[14] *See* Mooser 30(b)(6) Deposition at 189 (attached at Exhibit 4) ("Q. When did they come into your office to train employees on the FAST system?  A.  It would have been in 2005 when we made the transition to the FAST system."); January 13, 2012 deposition of First American's former employee, Tammy Likes ("Likes Deposition") at 48 ("Q.  Other than changing the software, were there systemic changes in the way things were done under First American's guidance or ownership? A.  No.  Pretty much we ran business as usual."). Copies of the portions of the Likes Deposition referenced in this brief are attached and incorporated here as **Exhibit 11**.

[15] *See* February 10, 2012 deposition of First American's Rule 30(b)(6) witness, Kenneth MacKay ("MacKay 30(b)(6) Deposition") at 92-100 (stating all training materials, policies, and handbooks of First American were available to all First American employees and conveyed First American's expectations of how its employees should execute their duties); Mooser 30(b)(6) Deposition at 191-193 (attached at Exhibit 4) (explaining that although the employees had access to all training materials, "there was thousands and thousands of documents and things you could look at in the underwriting library to the university. . . .  It would take them months to go through all that.  So we do on-the-job training."); Likes Deposition at 54 (attached at Exhibit 11) (stating First American training webinars were not "required viewing" for First American Louisville office employees).  Copies of the portions of the MacKay 30(b)(6) Deposition referenced in this brief are attached and incorporated here as **Exhibit 12**.

[16] *See* Mooser 30(b)(6) Deposition at 189 (attached at Exhibit 4) ("Q.  Did they – did somebody from outside the First American Louisville office ever come to the Louisville office to do training on the FAST system or on wire transfers after 2005?  A. I don't believe so."); Likes Deposition at 56 (attached at Exhibit 11) ("Q.  Okay. So if I understand it then, First American didn't conduct any sort of formal training program when new employees came on board, is that correct?  A.  That's correct.").

[17] *See* Mooser 30(b)(6) Deposition at 190 (attached at Exhibit 4) (explaining that "for the Louisville office the main source of training for a new employee was on-the-job training.").

American's Rule 30(b)(6) witness, Chris Mooser, testified that he simply could not tell whether the First American Louisville Office's acts and omissions in the summer of 2008 were consistent with First American's policies.[18] That training—or lack thereof—of course, led to devastating consequences for that office, and for Texas Capital, in the summer of 2008.

### D.  The Agreement Between Texas Capital Bank, N.A. and Prajna Group, Inc.

Prajna Group, Inc. d/b/a Liberty Mortgage Funding ("Prajna") originated real estate loans in 2008, but needed a third-party to participate in the loans by providing the majority of the funds to close each loan.  Prajna had been working with another "warehouse lender," First Collateral Services, Inc. ("First Collateral"), for a few years prior to March 2008.[19]  Prajna and First Collateral had regularly used the First American Louisville office for loan closings, so First American had experience with transactions involving warehouse lenders.[20]

When First Collateral began winding-up its business in early 2008, Prajna sought a warehouse agreement with Texas Capital Bank.  Texas Capital Bank entered into a warehouse agreement with Prajna on March 7, 2008.  This was an arrangement with Texas Capital Bank to

---

[18] Mooser 30(b)(6) Deposition at 49 (attached at Exhibit 4) ("Q.  The acts and omissions of First American in 2008, if – am I correct that you're not going to be able to testify whether or not they complied with those policies and procedures that First American had, if First American had them, the ones that your're not aware of, there's no way for you to tell me whether or not those acts and omissions were in compliance with First American's policies and guidelines, correct?  A. Correct.")

[19] *See* October 4-5, 2010 deposition of Prajna's former employee, Bounmy Phouthavong ("Phouthavong Deposition Day 1" and "Phouthavong Deposition Day 2") at Day 1, 204-205 (describing Prajna's three warehouse lenders and their relevant time periods).  Copies of the portions of the Phouthavong Deposition Day 1 are attached and incorporated here as **Exhibit 13**.  Copies of the portions of the Phouthavong Deposition Day 2 are attached and incorporated here as **Exhibit 14**.

[20] *See* Mooser 30(b)(6) Deposition at 32-33 (attached at Exhibit 4) ("Q.  Let's define the situation.  The situation I'm referring to is one where you have a retail lender such as Prajna originating a loan, having the borrower interact with them, and then the loan is actually funded by another entity from that other entity's bank account.  That's the situation I'm describing.  Was that – that wasn't rare for the loans First American was closing, was it?  A. No.  Back in '08 I wouldn't – that would not be rare.  Q. Okay.  In '07?  A. No.").

purchase loan participations, *not* a line of credit on which Prajna could draw upon on demand. [21] First American's employees testified they *believed* the funds were owned by Prajna and Prajna could direct the funds wherever it wanted, but they cite no basis for that belief, and it was mistaken. Prajna was required to submit to Texas Capital Bank information about each loan for the bank's review.[22]   Texas Capital Bank's employees would analyze specific pieces of the information provided to ensure that the loan was one in which the bank would agree to participate.

If the bank was not satisfied with a proposed loan, it could refuse to fund it.  Prajna could not direct the bank to fund a loan.  The bank also used fraud-detection products, including *First American's* own CoreLogic product, in order to protect its investment in each loan transaction.[23] However, neither First American's fraud detection products nor those sold by others detected the kind of fraud that occurred here.  For example, Texas Capital used a fraud-detection service on the final fraudulent loan, the "Verrett" loan, and it did not detect the fraud that had been ongoing for some time.[24]  Only the settlement agent can prevent the kind of fraud at issue here, where the settlement agent is tricked into disbursing the funds inappropriately.  Texas Capital Bank relied

---

[21]   *See* Agreement #1812 by and between Prajna as Seller and Texas Capital Bank as Bank, attached and incorporated here as **Exhibit 15** (the "Warehouse Agreement"), at Art. II.2 ("The decision to purchase a Participation Interest in a Qualifying Mortgage Loan shall be made by Bank in its sole and absolute discretion.").

[22]   *See* the Warehouse Agreement (attached at Exhibit 15) at Art II.1 (describing information Prajna included when making a request for Texas Capital Bank to purchase a participation interest).

[23]   *See* October 29, 2010 deposition of Texas Capital Bank's former employee, Pamela Robinson ("Robinson Deposition") at 15-16 (describing Texas Capital Bank's use of these products).  As an example, see TCB 8 through 26, which are documents contained in Texas Capital's Ronald Carmichael loan file, attached and incorporated here as **Exhibit 16**.  "One click delivers a user-friendly priority sequence of collateral risk management and fraud prevention reports that best fit your business needs."  TCB 8.  Copies of the portions of the Robinson Deposition referenced in this brief are attached and incorporated here as **Exhibit 17**.

[24]   *See* TCB 6021 through 6028, attached and incorporated here as **Exhibit 18**.  The "Verrett" borrower and property both received "low risk" ratings by the FraudGUARD product.  TCB 6021.

on the settlement agent, First American, to properly do its job and distribute the funds only to the proper parties at an actual closing or return the funds to the party that wired them to First American.   Had First American's employees followed its own policies and done their job properly, the fraud would not have resulted in a loss to Texas Capital.

Another important aspect of the agreement between Texas Capital Bank and Prajna was its purposeful structuring of the parties' relationship in a way that would keep possession of the loan proceeds provided by the bank out of Prajna's control. Similarly, Prajna was never to have possession of the bank's collateral, the original executed note that resulted from a transaction. The bank only wired closing funds to the settlement agent; it never wired closing funds to Prajna. Also, upon a loan closing, the executed note would be sent directly to Texas Capital Bank.  First American's employees knew this was an important component of the arrangement between the two entities.  According to JoAnn Embry, there was always a "big to-do about that."[25]

**E.  <u>The 2008 Transactions Involving Texas Capital Bank, First American, And Prajna</u>**

Texas Capital agreed to participate in approximately 140 loans originated by Prajna from March 2008 through the filing of Prajna's bankruptcy in August 2008.  For loans involving the First American Louisville office, Texas Capital Bank sent funds to First American, with instructions via the wire transfer information, to close a loan for the specific borrower identified by name on the wire information.  In each of those instances, First American did exactly as Texas Capital instructed and expected: it looked up the borrower identified on the wire transfer order, found the file in its system, and closed a loan to the borrower identified by Texas Capital Bank's

---

[25] *See* Embry Deposition at 14-15 (attached at Exhibit 10) (explaining that there was "always a big to-do" to remind employees handling a Texas Capital Bank transaction to send the note directly to Texas Capital Bank). The closing instructions for legitimate loans directed that the note was to be sent directly to Texas Capital Bank.  An example of this instruction from one of First American's files is attached and incorporated here as **Exhibit 19**.

wire transfer.  First American was not the only title company Prajna used to close loans funded by Texas Capital.  In fact, Bounmy Phouthavong, Prajna's vice-president and the fraudster here, testified that she tried to convince other settlement agents to forward Texas Capital Bank's funds to Prajna, but those settlement agents declined to honor her request, recognizing that Prajna had no authority to direct disposition of the funds.  Ms. Phouthavong testified that "there was [sic] some title companies that just said, 'Oh, you know, we can't do that.  I have to send it directly back to the warehouse line.'"[26]  This is, of course, what the First American policies also required.  However, the First American Louisville employees ignored these policies and complied with her requests—resulting in losses on the six separate wire transfers discussed below.

### (1) Charles Kerekes and Kenneth Dunn – June 27, 2008

On June 20, 2008, Texas Capital Bank wired to First American $131,911.18 to close a "Dunn" loan.[27]  The Dunn loan was apparently a legitimate loan.  However, on the same day First American received the funds, Phouthavong requested that the $131,911.18 be sent to Prajna's operating account (the "National City Operating Account") rather than return the funds to Texas Capital Bank.[28]  First American complied and forwarded the funds the same day.[29]  Then, one week later, on June 27, 2008, First American received a wire transfer in the amount of $132,079.90 for a fraudulent loan in the name of borrower Charles Kerekes.[30]  The wire came

---

[26] Phouthavong Deposition Day 1 at 187 (attached at Exhibit 13).

[27] *See* documents related to the Dunn/Kerekes transactions ("Dunn/Kerekes Documents"), attached and incorporated here as **Exhibit 20**, at FATIC 8537, FATB 315 (wire information received by First American), FATIC 7635 (escrow account statement showing receipt of funds), and TCB 3608 (Texas Capital Bank outgoing wire advice).

[28] *See* Dunn/Kerekes Documents, at FATIC 8538 (attached at Exhibit 20).

[29] *See* Dunn/Kerekes Documents, at FATIC 8539 (attached at Exhibit 20).

[30] *See* Dunn/Kerekes Documents, at FATB 315 (attached at Exhibit 20).

from Texas Capital Bank (not Prajna's National City Operating Account).  First American was not expecting these funds, because it did not have a file for a Charles Kerekes loan.  First American did not have a file, because Prajna had not requested any services from First American for a Kerekes loan.[31]

The wire information sent by Texas Capital Bank and received by First American contained information designating that the funds were to be used to close a loan in the name of Charles Kerekes.[32]  Despite this, Ms. Phouthavong convinced JoAnn Embry, the First American employee complying with the first four of the six fraudulent requests, to apply the funds transferred for the Kerekes loan to the Dunn loan that was then scheduled to close.[33]  First American simply marked out the borrower name on the wire information from Texas Capital Bank and wrote "Dunn" in its place.[34]  This violated both First American's policies and the Texas Capital Bank instructions that the wire was for the "Kerekes" loan.

First American did not contact Texas Capital Bank about either of these transactions. There is also no evidence that First American asked Prajna why it wanted to use the "Kerekes" funds for the Dunn loan, even though First American had already sent Prajna the money for this loan.

---

[31] *See* Phouthavong Deposition Day 1 at 159 (attached at 13) (stating First American knew "it wasn't one of their loans that they were closing."); Phouthavong Deposition Day 2 at 246-247 ("[T]he only thing that the title companies received was a wire, and they didn't – they wouldn't have known what to do with that wire.").

[32] Dunn/Kerekes Documents, at FATIC 8533 (attached at Exhibit 20).

[33] *See* February 2, 2011 E-mail from Scott Barber to Matthew Lindblom, attached and incorporated here as **Exhibit 21**.

[34] Dunn/Kerekes Documents, at FATIC 8533 (attached at Exhibit 20).

*(2) Ronald Neff – July 3, 2008*

On July 3, 2008, Texas Capital Bank wired $331,740 to First American to fund a "Neff" loan.[35]  Just like the Kerekes funds, First American was not expecting the Neff funds, because it did not have a file for such a loan.[36]  The only information First American had with respect to the Neff loan was the information sent to it by Texas Capital Bank in the wire information, which designated that the funds were to be used to close a loan in the name of Ronald Neff.[37]  The information also included a file number purportedly associated with the Neff loan (but First American had no such file number in its system).[38]  *Without identifying the borrower name, or even the correct dollar amount, and without any explanation or reason whatsoever (not even that it was a mistaken wire)*, Ms. Phouthavong requested by email that Ms. Embry forward the funds to Prajna's bank account.  The email is attached and incorporated here as **Exhibit 23**.  Ms. Embry complied with the request.[39]

*(3) Glenn MacPherson – July 10, 2008*

One week later, on July 10, 2008, Texas Capital Bank wired $302,620.40 to First American to fund a "MacPherson" loan.[40]  Just like the Kerekes and Neff funds, First American was not expecting the MacPherson funds. It did not have a file for a Glenn MacPherson loan, and there was no loan closing scheduled for a MacPherson loan because Prajna had not requested any

---

[35] *See* documents related to the Neff transaction ("Neff Documents"), attached and incorporated here as **Exhibit 22**, at TCB 4312, FATB 316, FATIC 4853, and FATIC 7601.

[36] *See* footnote 31, *supra*.

[37] *See* Neff Documents, at FATB 316 and FATIC 4853 (attached at Exhibit 22).

[38] *See* Neff Documents, at FATB 316 (attached at Exhibit 22).

[39] *See* Neff Documents, at FATIC 4859 (attached at Exhibit 22).

[40] *See* documents related to the MacPherson transaction ("MacPherson Documents"), attached and incorporated here as **Exhibit 24**, at TCB 4385, FATB 317, and FATIC 7602.

services from First American for a MacPherson loan.[41]   The only information First American had

with respect to the MacPherson loan was the information sent to it by Texas Capital Bank in the

wire information, which designated that the funds were to be used to close a loan in the name of

Glenn MacPherson.[42]   The information also included a file number purportedly associated with

the MacPherson loan (but First American had no such file).[43]   Ms. Phouthavong contacted Ms.

Embry and told her that the wire had been sent to First American by mistake and requested that

the funds be forwarded to Prajna's bank account.[44]   Ms. Embry complied.[45]

   *(4) Tom Triolo – July 11, 2008*

   The next day, on July 11, 2008, Texas Capital Bank wired $368,334.90 to First American

to fund a "Triolo" loan.[46]   Just like the Kerekes, Neff, and MacPherson funds, First American

was not expecting the Triolo funds. It did not have a file for a Tom Triolo loan, and no closing

was scheduled for a Triolo loan, because Prajna had not requested any services from First

American for a Triolo loan.   The only information First American had for the Triolo loan was the

information sent to it by Texas Capital Bank in the wire information, which designated that the

funds were to be used to close a loan in the name of Tom Triolo.[47]   The Triolo loan and the final

---

[41] *See* footnote 31, *supra.*

[42] *See* MacPherson Documents at FATB 317 (attached at Exhibit 23).

[43] *See* MacPherson Documents at FATB 317 (attached at Exhibit 23).

[44] Phouthavong Deposition Day 1 at 161-164 (attached at Exhibit 13) (describing her requests to Ms. Embry: "I would call and say, "Oh, I sent' – you know, "you were sent that by mistake."  And it didn't – the moneys didn't match to any of the loans that they were working, so they knew it wasn't their loan or their funds.").

[45] *See* MacPherson Documents at FATIC 4857 (attached at Exhibit 23).

[46] *See* documents related to the Triolo transaction ("Triolo Documents"), attached and incorporated here as **Exhibit 25**, at TCB 4423, FATB 318, and FATIC 7602.

[47] *See* Triolo Documents, at FATB 318 (attached at Exhibit 24).

two fraudulent loans discussed below did not include a First American file number.   Ms. Phouthavong told Ms. Embry that the wire had been sent to First American by mistake and requested that the funds be forwarded to Prajna's bank account.[48]   Ms. Embry complied.[49]

*(5) Angel Garcia and Bonnie Yarbrough – July 14, 2008*

The next business day, on July 14, 2008, Texas Capital Bank wired $402,204.79 and $377,668.45 in two separate wires to First American to fund a "Garcia" loan and a "Yarbrough" loan, respectively.[50]   Just like the Kerekes, Neff, MacPherson, and Triolo funds, First American was not expecting these transfers, and it did not have a file for either loan, because Prajna had not requested any services from First American for a Garcia or Yarbrough loan.   The only information First American had with respect to these fraudulent loans was the information sent to it by Texas Capital Bank in the wire information, which designated that the funds were to be used to close loans in the name of Angel Garcia and Bonnie Yarbrough.[51]   Presumably, Ms. Phouthavong told someone at the First American Louisville office that the wires were sent by mistake and requested that the funds be forwarded to Prajna's account, because First American both received and forwarded the Garcia and Yarbrough funds before 1:00 p.m. on July 14, 2008.[52]

In each of the six fraudulent loan transactions discussed above, First American failed to follow its own policies and procedures.   First American complied with the requests (1) without

---

[48] *See* footnote 44, *supra*.

[49] *See* Triolo Documents, at FATIC 4857 (attached at Exhibit 24).

[50] *See* documents related to the Garcia/Yarbrough transactions ("Garcia/Yarbrough Documents"), attached and incorporated here as **Exhibit 26**, at TCB4495, TCB 4741, FATB 319, FATB 320, and FATIC 7602.

[51] *See* Garcia/Yarbrough Documents, at FATB 319 and 320 (attached at Exhibit 25).

[52] *See* Garcia/Yarbrough Documents, at FATIC 4856 and 4855 (attached at Exhibit 25).

reporting the mistaken wire to First American's Reqional Banking Department, in violation of First American's policy; (2) without relying on anything in writing from Prajna[53]; (3) without relying on anything in writing from Texas Capital; (4) in contravention of the express written instructions from Texas Capital in the wire information to use the funds to close loans in the name of the borrowers listed; and (5) without asking Prajna a reason for the so-called "returns." Moreover, First American sent the funds to Prajna without requiring a communication with Texas Capital Bank to notify it of the "big red flags" raised by the repeated requests, as First American's 30(b)(6) witness Ken MacKay, said she should have.[54]

**Worthy of note, Ms. Embry was out of the office on vacation on July 14, 2008, so she did not handle the last two transactions.**[55]   Instead, it appears Lisa Smith, another First American employee with a position similar to Ms. Embry's position, handled them.[56]   Perhaps this was the change that made all the difference.  Ms. Smith informed Tammy Likes, the office manager for the Louisville office, about the unusual requests on that day.[57]   First American then decided it should not comply with any further requests from Ms. Phouthavong to forward funds

[53] As discussed above, the Neff transaction included an email from Ms. Phouthavong, but without any explanation for why the funds should be forwarded to Prajna.

[54] *See* MacKay 30(b)(6) Deposition at 118-129 (attached at Exhibit 12).

[55] *See* JoAnn Embry's Vacation Calendar for 2008, FATIC 10779, attached and incorporated here as **Exhibit 27**; *see also* Mooser 30(b)(6) Deposition at 132-133 (attached at Exhibit 4) (stating Lisa Smith handled the July 14, 2008 wires because Ms. Embry was out of the office); Likes Deposition at 131 (attached at Exhibit 11) (stating Ms. Embry "wasn't there that day" when Ms. Likes learned about Ms. Phouthavong's requests from Lisa Smith).

[56] *See* Garcia/Yarbrough Documents, at FATIC 4856 and 4855 (attached at Exhibit 25).  These documents reflect that the wire transfer orders directing the funds be sent to Prajna were "Issued By" Lisa R. Smith.

[57] *See* Mooser 30(b)(6) Deposition at 132 and 138 (attached at Exhibit 4) (stating Lisa Smith reported Ms. Phouthavong's requests on July 14, 2008); Likes Deposition at 130 (attached at Exhibit 11) (stating she learned of Ms. Phouthavong's requests from Lisa Smith).

to Prajna's bank account.  This decision was made and reported to Ms. Phouthavong within 48 hours of the office manager becoming aware of the transfers.[58]

Ms. Phouthavong described the communication from First American as follows:

Q.  You set off some alarm bells, you think?

A.  M-hm [affirmative].

Q.  Did they ever accuse you of anything or –

A.  No.  They just said, "We have to, you know, just follow the" – they – they said they were taking **guidelines** and they just really – there were certain steps that they had to follow, and then they did it.

. . .

A.  I don't – I mean, I don't know what they had.  I mean, I don't know that they had in place like as far as in writing or – or – I just knew that it was towards the end they just got a lot more strict on the process that they have to follow.

Q. . . . . [C]an you tell me about that conversation, and who – who had that conversation with you, and how did it go?

A.  I think it was Lisa [Smith] and she – yeah, she was apologetic.  She's like, you know, "I'm really sorry, but we've – they're just getting more strict on the process and the steps that we've got to go through.

So I've got to return – you know, if anything else comes in, I've got to return it exactly the way – where it had come from."[59]

## F.  JoAnn Embry and Lisa Smith's Suspicions

Ms. Embry testified that she was "leery" of the requests.[60]  Lisa Smith states in her declaration that Ms. Embry informed her of Ms. Phouthavong's requests and of Ms. Embry's

---

[58]  *See* Mooser 30(b)(6) Deposition at 138-139 (attached at Exhibit 4) (stating that he has no reason to dispute that First American told Ms. Phouthavong on July 14 or July 15).

[59] Phouthavong Deposition Day 1 at 163-164 (attached at Exhibit 13) (emphasis added).

[60] Embry Deposition at 108-109 (attached at Exhibit 10).

concerns with complying with the requests.[61]   Ms. Smith also states that she "had concerns that

Ms. Phouthavong's requests were out of the ordinary and suspected some form of wrongdoing on

[Ms. Phouthavong's] part."[62]   Ms. Smith recalls that Ms. Embry expressed the same concerns to

her.[63]

## IV.  PROCEDURAL BACKGROUND

### The Court's Prior Ruling On Summary Judgment Motions

In the first half of 2011, the parties each filed motions for summary judgment on Count I

of the Complaint, which asserts a claim against First American for breach of its bailment

contract.  The Court ruled on the motions on September 27, 2011 (D.I. 83).  In its opinion, the

Court agreed with Texas Capital and ruled that a bailment contract arose between Texas Capital

Bank and First American with respect to the wired funds.  *See Tex. Capital Bank, N.A.*, 2011 U.S.

Dist. LEXIS 109672, at *12 ("Here, the undisputed facts demonstrate that the relationship

between Texas Capital and First American Title constituted such a constructive bailment, if not a

bailment implied in fact.").  The Court further ruled that First American had a duty to either (a)

return the wired funds to Texas Capital or (b) dispose of the wired funds in accordance with

Texas Capital's instruction.  *Id.* at *13 ("A bailee has a duty to hold the bailed property and either

return it to the bailor or dispose of it in accordance to the bailor's instruction.").

The Court recognized that Prajna was not Texas Capital's agent and that "the issue of

liability on the bailment narrows to whether First American Title properly discharged its duties

under the bailment by disposing of the funds according to Texas Capital's instructions."  *Id.*  The

---

[61] *See* Lisa Smith Declaration ("Smith Declaration") at ¶ 4.  A copy of the Smith Declaration is attached and incorporated here as **Exhibit 28**.

[62] *See* Smith Declaration at ¶ 7 (attached at Exhibit 27).

[63] *See* Smith Declaration at ¶ 7 (attached at Exhibit 27).

Court held that there was a "genuine dispute as to the terms by which Defendant held Texas Capital's funds in bailment," and therefore summary judgment was not appropriate at that time. *Id.* at *14. The Court's opinion suggested that Prajna's standard closing instructions, which state that if the loan does not close within 48 hours, the funds should be returned to Prajna, might also be instructions for the six fraudulent loans. *See id.*

Since the Court's opinion was issued, the parties have conducted further discovery. Texas Capital deposed the First American Louisville office manager, Tammy Likes, and three of First American's Rule 30(b)(6) witnesses. Texas Capital has also received numerous documents regarding First American's internal guidelines, policies, and procedures for handling funds held in its escrow accounts. Although Texas Capital requested these documents a year and a half ago, First American only recently produced them, less than a month ago. There are now undisputed facts in the record that establish that summary judgment should be granted in Texas Capital's favor on Count I of the Complaint.

## IV. ARGUMENT AND AUTHORITY[64]

### A. First American Breached The Bailment Contract By Not Complying With Texas Capital's Instructions When First American Forwarded The Wired Funds To Prajna.

Because it has been established that First American did not return the wired funds to Texas Capital, the critical question for this motion is whether First American was following Texas Capital's instructions when it sent the funds to Prajna.If it was not following Texas Capital's instructions, it unquestionably breached the bailment contract.

---

[64] As the Court knows, summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In considering a motion for summary judgment, the Court views all facts and makes all inferences in a manner most favorable to the non-moving party. *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). While the moving party must demonstrate that no genuine issue of material fact exists, in response, the non-moving party must move beyond the pleadings and present evidence in support of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

*(1) First American Has Consistently Asserted That It Did Not Follow And Was Not Required To Follow Texas Capital Bank's Instructions.*

From First American's first correspondence responding to Texas Capital's initial inquiries into this matter in 2008, to its recent Rule 30(b)(6) witness depositions, First American has steadfastly maintained that it was not required to follow *Texas Capital's* instructions, but was instead required to follow *Prajna's* instructions with respect to the Wired Funds. The following excerpts evidence First American's insistence that it was not acting on instructions from Texas Capital:

- August 29, 2008 email from John T. LaJoie, VP and Divisional Counsel for First American, to Tim Vineyard, attorney for Texas Capital: "Upon reviewing the transactions with the local office, it is apparent that the funds sent to that office belonged to [Prajna]. Since First American does not have a contractual relationship with Texas Capital Bank, we must respectfully decline your request to furnish information."[65]

- Laura K. Conrad, First American's Divisional Claims Counsel has stated the following: "We discovered that First American did, in fact, receive the funds and *having received no instruction with regard to the funds from [Texas Capital Bank] or Prajna, immediately contacted Prajna for further direction*. . . . At *Prajna's* direction First American wired the funds to the lender, Prajna . . . ."[66]

- First American's answer to the first amended complaint denies that it received disbursement instructions from Texas Capital.[67]

- First American's answer to the first amended complaint denies it agreed to disburse funds as authorized by Texas Capital.[68]

---

[65] A copy of this email is attached and incorporated here as **Exhibit 29**.

[66] February 10, 2009, Letter from Laura K. Conrad (Exhibit 10 to Second Amended Complaint) (emphasis supplied). First American "denies any allegations inconsistent with the substantive content of the Conrad Letter." First American's Answer To First Amended Complaint (D.I. 36) ("Answer") ¶ 49.  A copy of this letter is attached and incorporated here as **Exhibit 30**.

[67] Answer (D.I. 36) ("Answer"), ¶ 17.

[68] Answer ¶ 18.

- "FATIC admits that it transferred the [bailed funds] to [Prajna] upon [Prajna's] request." "FATIC admits that it transferred the [bailed funds] to [Prajna] upon [Prajna's] direction."[69]

- "First American's *entire course of dealing* was with Liberty/Prajna. . . ."[70]

- "First American made the decision to no longer comply with Prajna's requests to redirect loan funds to Prajna because it viewed the mistaken wires as a nuisance that required First American's employees to take time away from their normal daily tasks."[71] If First American believed Texas Capital's instructions to it were to forward the wired funds to Prajna, First American could not have had the discretion to change course and <u>stop</u> forwarding funds to Prajna without first seeking permission from Texas Capital, the bailor.  This, of course, it did not do.

- First American has argued, and its witnesses have testified, that First American's personnel believed the bailed funds were owned by Prajna.[72]

- "Reasonably relying on the *instructions they received from their customer Phouthavong*, First American transferred the requested funds to Prajna on six occasions."[73]

- "Reasonably relying on such false representation by BG, FATIC transferred each of the [six transfers] to Prajna."[74]

- "First American contends that it had no relationship with and owed no duty to Texas Capital."[75]

---

[69] Answer ¶¶ 24, 25, 28, 29, 32, 33, 36, 37, 40, 41, 44, 45.

[70] First American Title Insurance Co.'s (1) Reply In Further Support Of Motion For Partial Summary Judgment On Plaintiff's Claims Involving The National City Wires And (2) Response To Plaintiff's Cross-Motion For Partial Summary Judgment (D.I. 75) ("First American's National City Reply"), at 5 (emphasis supplied).

[71] First American's National City Reply, at 7; *see also* Declaration of Tammy Likes, attached and incorporated here as **Exhibit 31**.

[72] *See* First American Title Insurance Co.'s (1) Reply In Further Support Of Motion For Partial Summary Judgment Against Count I Of Plaintiffs' First Amended Complaint And (2) Response To Plaintiffs' Cross-Motion For Partial Summary Judgment (D.I. 66) ("First American's Count I Reply") at 8 ("First American personnel with whom Phouthavong interacted believed the [bailed] funds belonged to Liberty/Prajna . . . .").

[73] First American's Count I Reply at 18 (emphasis supplied).

[74] First American's Third Party Complaint (D.I. 38) at ¶ 20.

[75] Settlement Conference Report (D.I. 51).

- First American's Rule 30(b)(6) witness, Chris Mooser, testified on February 13, 2012 that he still does not believe First American and Texas Capital Bank had a relationship in 2008 and he continues to believe (despite this Court's prior opinion) that the funds First American forwarded to Prajna's operating account were sent to First American by Prajna.[76]

- Chris Mooser also testified as follows: "As I stated in my prior deposition, it's my point that we simply followed the instructions of [Prajna] and returned the money to where they wanted us to return it to, period."[77]

Thus, it is *absolutely crystal clear* that First American did not disburse the six wires in accordance with Texas Capital's instructions. First American's employees in fact believed they had *no* instructions from Texas Capital and claimed not to be aware of Texas Capital's existence:

> I never heard of Texas Capital until this case.[78]

> I never heard of Texas Capital until all this thing happened.[79]

> I, nor anyone at First American, believed [Texas Capital Bank] had instructed us to send the mistaken wires to Prajna, and we did not realize the wired funds came from Texas Capital.[80]

---

[76] Mooser 30(b)(6) Deposition at 17 (attached at Exhibit 4) ("Q. Okay. Did First American have a relationship with Texas Capital in 2008? A. Not that I'm aware of."); Mooser 30(b)(6) Deposition at 19-20 ("Q. It's still your belief today that Prajna was sending First American money and it asked you to send it back to Prajna? A. Absolutely. . . . Q. Okay. So the funds that were wired from Texas Capital to First American in the summer of 2008 for fraudulent loans, it's your testimony today that those funds came from Prajna? A. Yes.").

[77] Mooser 30(b)(6) Deposition at 24 (attached at Exhibit 4).

[78] *See* February 3, 2011 deposition of First American's former manager, Shawn Freibert ("Freibert Deposition") at 91; *see also id.* at 83 ("I never heard of Texas Capital."). Copies of the portions of the Freibert Deposition referenced in this brief are attached and incorporated here as **Exhibit 32**.

[79] *See* January 25, 2011 deposition of First American's former manager, Chris Mooser ("Mooser 2011 Deposition") at 99; *see also id.* at 115 ("Again, I didn't even know Texas Capital's name at that point."); *id.* at 148 ("Again, our lender, our relationship was with Prajna. I didn't even know Texas Capital Bank or never had any contact with them or any correspondence with them that I'm aware of or that I remember."). Copies of the portions of the Mooser 2011 Deposition referenced in this brief are attached and incorporated here as **Exhibit 33**.

[80] Smith Declaration, at ¶ 5 (attached at Exhibit 27).

First American cannot now argue that it believed it was complying with Texas Capital Bank's instructions.  It has offered absolutely no evidence to support such an argument, and the evidence it has offered is directly counter to such an argument.

This Court has held that First American, as bailee, had an obligation to either return the wired funds to Texas Capital Bank or disburse them in accordance with Texas Capital Bank's instructions.  First American has testified and argued that it did neither.  It is liable to Texas Capital for the loss of the funds.  Summary judgment should be granted in favor of Texas Capital.

*(2)   First American In Fact Did Not Follow Texas Capital's Instructions.*

*(a)   The Information Included With The Wire Transfers Is The Only Possible Source Of Instruction From Texas Capital.*

For every transfer, Texas Capital Bank included the name of the borrower for which the funds were to be used within the wire information it sent to First American.  This is the *only* instruction First American had from Texas Capital Bank for the transfers.  The wire information included the borrower name for the loan for which the funds were being sent, indicating the funds were to be used to close a loan to that borrower.[81]  First American has argued that this information could not be an instruction or direction from Texas Capital, but its witnesses recognize that is exactly why such information is included with wires.  Chris Mooser, one of First American's Rule 30(b)(6) witnesses, testified that wires *First American* routinely send must include that information.[82]  Documents produced by First American also evidence this policy.[83]

---

[81]   *See* Dunn/Kerekes Documents (attached at Exhibit 20), at FATB 315; Neff Documents (attached at Exhibit 22), at FATB 316; MacPherson Documents (attached at Exhibit 23), at FATB 317; Triolo Documents (attached at Exhibit 24), at FATB 318; Garcia/Yarbrough Documents (attached at Exhibit 25), at FATB 319.

[82]   *See* Mooser 30(b)(6) Deposition at 49-50 (attached at Exhibit 4) (describing why he believes that information is included).

Mr. Mooser testified that the reason First American includes that information in wires is so that the receiver of the wire knows the purpose for which First American sent the wire.[84]  First American expects the recipient to use the funds for that purpose.  Two of First American's Rule 30(b)(6) witnesses recognized that Texas Capital Bank included the information to tell First American what it was supposed to do with the funds.[85]  First American's position that every wire recipient except it should follow the instructions on the wire has no credibility whatsoever.

First American handled wire transactions regularly in 2008.  Its employees charged with handling those wire transactions must have been trained on, or at least aware of, the most basic aspects of a wire transfer.  The information they received with the wires at issue from Texas Capital Bank could only be reasonably interpreted to show that the funds were Texas Capital Bank's funds.  Mr. Mooser acknowledged that it would have been a mistake to understand that the wire information meant anything other than that Texas Capital Bank's funds were being sent to First American.[86]  Each of the wires contained information clearly showing that Texas Capital was both the sending bank *and* the originator of the wire: [87]

---

[83]  *See* Escrow Accounting Manual (attached at Exhibit 2), FATIC 11929 ("Complete wire form.  In the comment section be sure to include any information for further credit to with full names addresses and date of birth of the account holder.  Payoff wires must include borrowers name, loan number and property address.").

[84]  *See* Mooser 30(b)(6) Deposition at 50 (attached at Exhibit 4) (stating that information tells the receiver why the funds were sent); Mooser 30(b)(6) Deposition at 94 (attached at Exhibit 4) ("Q.  And the purpose is to tell the receiver, this is what you're supposed to be doing with the funds, this is why we're sending you the funds, right? A.  Sure.").

[85]  *See* MacKay 30(b)(6) Deposition at 214-217 (attached at Exhibit 12) (stating the wire information tells First American what it is supposed to do with the wired funds);  Mooser 30(b)(6) Deposition at 94-95 (attached at Exhibit 4) (stating the wire information communicated the "intended purpose" for the funds).

[86]  Mooser 30(b)(6) Deposition at 70-74 (attached at Exhibit 4) (stating repeatedly that, based on information included with the wires from Texas Capital Bank, it would be a mistake to understand anyone other than Texas Capital Bank was sending the funds to First American).

[87]  This information is taken from First American's Kerekes file, FATIC 8533, attached at Exhibit 20.

```
     $132,079.90

   ACCOUNT:  3020480000
      TYPE:  WIRE TRANSFER CREDIT
       REF:  20081791098600
      IMAD:  20080627K1B7041C000914
      OMAD:  20080627L1B78J1C00404006271700FT01

 SNDBKABA:  111017979
 SNDBKNAME: TEXAS CAPITAL DAL
 RCVBKABA:  122241255
 RCVBKNAME: FST AM TR CO SANA
       ORG:  TEXAS CAPITAL BANK6060 NORTH CENTRAL
             EXPRESSWAY SUITE 800 DALLAS, TX  75206
       OGB:
       BNF:  3020480000FIRST AMERICAN TITLE CO.
100 MALLARD CREEK RD :  WA: STE 400 LOUISVILLE
             KY
       OBI:  GF NBR:2007-1929789/KEREKESREGARDIN
             G: ████████ ████████
 RCVBKINFO:
   IBKINFO:
   BBKINFO:
   BNFINFO:
       BBI:
       RFB:
 PNRM TIME:  06/27/2008 14:00:37 [85]
```

There is nothing in that information that indicates that the funds have any relationship to Prajna.

First American occasionally received wires from Prajna's National City Operating Account, and

that information showed Prajna as the *originator* of the funds:[88]

```
     $86,892.22

   ACCOUNT:  3020480000
      TYPE:  WIRE TRANSFER CREDIT
       REF:  20081750796500
      IMAD:  20080623D1B74Q5C000752
      OMAD:  20080623L1B78J1C00273106231709FT01

 SNDBKABA:  083000056
 SNDBKNAME: NATIONAL CITY BANK
 RCVBKABA:  122241255
 RCVBKNAME: FST AM TR CO SANA
       ORG:  PRAJNA GROUP INC9300 SHELBYVILLE RD
             STE 400 LOUISVILLE,  KY 40222-5163
       OGB:
       BNF:  3020480000
       OBI:  STEPHANIE SIKORA
 RCVBKINFO:
   IBKINFO:
   BBKINFO:
  BNFINFO:
       BBI:
       RFB:  993257
 PNRM TIME:  06/23/2008 14:14:13
```

---

[88]  This information is taken from First American's "Sikora" file.  The full page is attached and incorporated here as **Exhibit 34**.

Thus, its employees had experience with receiving wires of funds that truly were from a Prajna-controlled bank account where Prajna was the originator.  For Prajna's employees to assume the wires from a Texas Capital Bank-controlled account at Texas Capital Bank (listing Texas Capital as the originator) were from a Prajna-controlled account would be gross error.  Even accepting as true that Ms. Embry or other First American employees understood that wire information to mean anything other than that the funds were Texas Capital Bank's funds, their mistake cannot prevent First American's liability for the loss:

> Bailees are liable not only for losses occasioned by their negligence, but for those that arise from their innocent mistakes in delivering goods to persons not entitled to receive them.  A delivery of bailed properly by the bailee to one who is not the true owner and who is not authorized by the bailor to receive it constitutes conversion, as well as a breach of the bailment contract. The bailee's liability for a misdelivery is the same whether the bailment is for the sole benefit of the bailor, the sole benefit of the bailee, or the mutual benefit of both.  Whether the action is brought in tort or in contract, the bailee is absolutely liable for loss or damage caused by the misdelivery, regardless of the fact that he or she may have acted in good faith and without negligence.  The bailee may be liable for a misdelivery even though it is the result of an innocent mistake or has been induced by fraud or trick.[89]

Thus, the only information First American had from the owner of the wired funds, the bailor Texas Capital Bank, was the information included on the wire transmissions themselves. First American had no loan file to examine to determine what it should do with the funds, it had no closing instructions applicable to the funds, and it had absolutely nothing else to consult for further or additional instructions from Texas Capital Bank.  If it was unsure of whether it should return the funds to Texas Capital Bank, its only other option as bailee was to contact Texas

---

[89] 8A Am. Jur. 2d *Bailment* § 133.

Capital Bank for additional instructions.  First American admits it did not do that.[90]  Instead, it took direction from a third party no-where mentioned in the wire information.

    *(b)  Ms. Phouthavong's Requests Were Not Instructions From Texas Capital Bank.*

    First American's employees relied on representations from Ms. Phouthavong as authority for transferring Texas Capital funds in First American's escrow account to Prajna.  Of course, this Court has already found that Ms. Phouthavong was not an agent for Texas Capital.  *See Tex. Capital Bank, N.A.*, 2011 U.S. Dist. LEXIS 109672, at *13 ("Prajna was in no way an agent of Texas Capital . . . .").  Thus, its willingness to rely on her representations to send millions of dollars owned by Texas Capital to Prajna is baffling.  There is simply no reasonable basis to argue that Ms. Phouthavong's instructions with respect to the wired funds were instructions from Texas Capital Bank.

    *(c)   Closing Instructions From Prior Loan Transactions Were Not Instructions From Texas Capital Bank Regarding The Six Transfers At Issue Here—First American Did Not Consult The Documents And Did Not Follow Them.*

    Although it has never explicitly argued that it relied on closing instructions from prior legitimate loan transactions in deciding to send the funds to Prajna, it has *suggested* that its transfer of Texas Capital Bank's funds to Prajna was authorized by the following language set forth in prior instructions:

> If for any reason this loan does not close within 48 hours of your receipt of funds, immediately return all documents to Lender and wire all funds only to: Liberty Mortgage Funding 9300 Shelbyville Road, Louisville, Kentucky 40222.

(the "48-Hour Policy").[91]

---

[90] First American's Answer at ¶ 53 ("FATIC admits that it did not inform [Texas Capital] that [Prajna] requested that FATIC return the Title Company Transfers to [Prajna] . . . .").

25

The first problem with this argument is that the 48-Hour Policy was not included in any documents for the six wires at issue here.  The only information First American had on which to decide what to do with the wired funds was the information on the wire documents from Texas Capital Bank.  Specific closing instructions for prior legitimate loan transactions, for which First American had files and closings scheduled do not serve as instructions for the wired funds, which it was not expecting and for which it had no files.

Indeed, First American has consistently argued that closing instructions are individual transaction-specific instructions and do not give rise to duties outside of the particular transaction with those instructions:

- "These Closing Instructions [which contain the 48-hour policy] are *transaction-specific*, however, and do not give rise to duties beyond the particular loan at issue."[92]

- "In each of those cases where First American did agree to provide settlement services, First American's duties were limited to those agreed upon by First American in a set of closing instructions agreed upon between First American and the lender (*i.e.*, Prajna). These closing instructions . . . do not give rise to duties beyond the particular loan at issue."[93]

- Indeed, First American has asserted that "Texas Capital was not a party to the closing instructions containing First American's duties."[94]  If Texas Capital was not a party to the closing instructions, the instructions and the 48-Hour Policy could not be an instruction from Texas Capital.

---

[91] First American has never argued that its employees actually looked at or relied on these instructions when complying with Ms. Phouthavong's requests.  Raising the 48-Hour Policy as an issue is merely an attempt to justify its actions after the fact.  As set forth below, First American acted solely as a result of poor to non-existent training and expediency.

[92] First American's Reply Memorandum In Further Support Of Motion To Dismiss ("First American's Motion To Dismiss Reply") (D.I. 22), at 12–13 (emphasis in original).

[93] First American's Motion To Dismiss Reply at 12-13.

[94] First American's National City Reply, at 10 n.12.

- The $1.9 million comprising of the six transfers was "not subject to *any* closing instructions or other agreement."[95]

- Tammy Likes, the office manager who made the decision to stop forwarding funds to Prajna was clear about here understanding of the 48-Hour Policy.  It was loan specific and not a general directive:

    Q.  Okay.  Is there any provision of this closing instruction that could create duties for any other loan transaction?

    A.  No.[96]

As discussed in subsection (a) above, the second reason that the 48-Hour Policy could not be relied upon to send the fraudulent loan money to Prajna is that First American had no information from Texas Capital, the bailor, that Prajna was the loan originator for those transactions.  Nothing in the wire information linked the funds to Prajna or a Prajna-originated loan.  The information contained no reference to Prajna or any of its employees or agents.  First American had no records tying the funds to Prajna.  Texas Capital had funded loans through the First American Louisville office for mortgage originators other than Prajna.[97]  There was simply no indication from Texas Capital that the wired funds were intended for a loan originated by Prajna.  First American determined the wires were for Prajna-originated loans solely based on the communications from the thief, on which it had no legal basis to rely.

The third reason that the 48-Hour Policy does not permit First American to escape liability is that it directs funds to be sent to Prajna only if a loan does not close within 48 hours.  First American violated even this instruction because it did not wait more than 48-hours after

---

[95] First American's National City Reply at 10 (emphasis supplied).

[96] Likes Deposition at 173 (attached at Exhibit 11).

[97] *See* Gary Ort Declaration, attached and incorporated here as **Exhibit 35**.

27

receiving the money to send it to Ms. Phouthavong.  First American received funds from Texas

Capital Bank and forwarded them to Prajna as follows:

| Date First American Received Funds From Texas Capital | Date First American Sent Funds to Prajna | Amount | Borrower |
|---|---|---|---|
| June 27, 2008 | ***Used for Dunn loan, which closed July 7, 2008 (discussed above) | $132,079.90 | Charles Kerekes |
| July 3, 2008 | July 7, 2008 | $331,740.00 | Ronald Neff |
| July 10, 2008 | July 11, 2008 | $302,620.40 | Glenn MacPherson |
| July 11, 2008 | July 11, 2008 | $368,334.90 | Tom Triolo |
| July 14, 2008 | July 14, 2008 | $402,204.79 | Angel Garcia |
| July 14, 2008 | July 14, 2008 | $377,668.45 | Bonnie Yarbrough |

Four of the six wires to First American were forwarded to Prajna *the same day* or the

following day. The Kerekes funds were never forwarded to Prajna, but instead were used to close

an entirely different loan at Prajna's direction. The Neff funds were held more than forty-eight

hours, presumably because of the holiday weekend (July 4 was on a Friday, the funds were

forwarded the following Monday). Thus, even if the 48-Hour Policy somehow applied to the

bailments, First American did not comply with that policy.  If First American instead contends

the instruction requires funds be "returned" no *later* than 48 hours after receiving them, then they

did not comply with the instruction in two of the six cases, Kerekes and Neff.  What is clear is

that First American was not relying on or complying with the 48-Hour Policy when it made its

decision to forward the Wired Funds to Prajna.  It made this decision solely on the basis of Ms. Phouthavong's instructions.

Other reasons that the 48-Hour Policy does not save First American from liability include that the 48-Hour Policy does not contain a reference to a particular bank account.  If First American believed the Wired Funds were coming from a Prajna-controlled account, there would be no reason to *forward* the funds to a different account at a different bank.  Also, the 48-Hour Policy refers only to "this" loan, which makes clear the policy only applies to the particular transaction.  Similarly, the 48-Hour Policy assumes First American has received loan documentation and has intended to close the loan, but for some reason the closing was cancelled. Obviously, this would not apply to the "mistaken" wire funds transactions, because First American never anticipated closing a loan related to those funds or borrowers.  Obviously, they do not apply in situations where no loan was even scheduled to close in the first place.  The office manager confirmed this understanding:

> Q.  . . . . Did First American rely on that instruction when the funds were
> sent to [Prajna]?
>
> A.  No.  You mean rely on these instructions?
>
> Q.  Uh-huh.
>
> A.  We'd only rely on these instructions if we had a loan that didn't close.
>
> Q.  So you would only rely on these if you had a loan scheduled in your
> system that then didn't close, is that accurate?
>
> A.  Yes, per these instructions.  If you're just strictly going off of these
> instructions, yes.
>
> Q.  Okay.  So this wouldn't apply then if funds were not tied to a loan that
> was not scheduled for closing, correct?

A.   Yeah.   That's just their account.   But this particular language is referring to this loan.[98]

The numerous problems with a defense based on the 48-Hour Policy makes clear that First American has pointed to it only as an after-the-fact justification for its actions.[99]

*(d) First American's Transfers Of Texas Capital Bank's Money To Prajna Were Purely Based On Poor Training, Expediency, and Convenience to First American, Not On Any Understanding of Its Legal Obligations.*

Throughout this litigation, First American offered theories based on after-the-fact justifications for bungled handling of Texas Capital Bank's money.   However, First American's employees have testified, unanimously, that they were not in fact wrestling with the question of who had the legal authority to direct them to disburse Texas Capital Bank's money.   Instead, for them it was simply a matter of convenience.   Chris Mooser, as First American's Rule 30(b)(6) witness, testified as follows:

Q.   Okay.   One of the two bases that you testified to earlier as being – well, the two things that you pointed to as authority for First American to send the funds to Prajna was the direction from the lender, Prajna, right?

A. Uh-huh.

Q.   If that instruction was something that First American had to comply with, where did it get the authority from to decline to honor those requests?

A.   Again, it's not the authority.   It's more of a – you know, we didn't get out our legal books and figure out what authority we had.   You're just trying to make your office run more efficient.   You make a decision.   You balance it – you balance it with making your client upset.   Apparently I'm hoping that Shawn and Tammy

---

[98] Likes Deposition at 172-173 (attached at Exhibit 11).

[99] Frist American simply did not believe the 48-Hour Policy was an instruction from Texas Capital Bank. Chris Mooser's 30(b)(6) testimony made clear that First American would have complied with a change to the instruction by Prajna at any time, even if that change was given orally, because Prajna created the closing instructions and had the authority to change them.  *See* Mooser 30(b)(6) Deposition at 169 (attached at Exhibit 4).

> reasoned with that and talked to BG and said, hey, we're going to send them back.  I could tell them, you know, I – you know, make up a reason that you have to send it back just so they correct their system.  It's – it's not that unheard of."[100]

Thus, First American was not following *any* instructions from Texas Capital—whether for these or other funds.  This is further evidenced by the fact that First American eventually declined to follow even Ms. Phouthavong's instructions to forward Texas Capital funds to Prajna.  While even Ms. Embry had become "leery" by that time, First American's eventual party line was that it was becoming a "nuisance."[101]   Nothing changed with respect to any instructions from Texas Capital Bank.  The only difference is that a different employee, Lisa Smith, handled the last two transfers and was plainly more inquisitive than Ms. Embry.  First American cannot have it both ways—it was either acting with the appropriate authority when it sent the funds to Prajna or it acted with appropriate authority when it stopped complying with Prajna's requests.  The latter decision was sanctioned by management, whereas funds were sent to Prajna by an untrained employee.  Indeed, even if the decision was based solely on the stated reason that forwarding funds was a nuisance for First American (and not the suspicion of wrongdoing as described by Lisa Smith), First American was either obligated to comply with Ms. Phouthavong's requests or it was not.

 *(3) First American Did Not And Cannot Rely On A Course Of Dealing With Texas Capital Bank To Justify Sending The Funds to Prajna.*

First American has already argued in this case that its "entire course of dealing was with Liberty/Prajna—it did not have any relationship (much less a "special relationship") with Texas

---

[100] Mooser 30(b)(6) Deposition at 141 (attached at Exhibit 4).

[101] *See* Likes Declaration at paragraph 10 (attached at Exhibit 30) (stating Ms. Smith regarded the requests as "burdensome and a distraction from their primary duties").

Capital."[102]  Chris Mooser, as First American's Rule 30(b)(6) witness, testified that he is still not aware of any relationship between First American and Texas Capital in 2008.[103]  First American's employees claim they were not even aware of Texas Capital's existence at the time of the wired funds transactions.  Under limited circumstances, a course of dealing between two parties may add or amend terms to a contract between those two parties.  *See* Williston on Contracts § 34:14 ("A habit of business confined to the two parties to a contract may by implication be adopted as an unexpressed part of it . . . .").  It is black-letter law, however, that both parties must be aware of the course of dealing in order for it to have any effect on the contract terms.  *See* Williston on Contracts § 34.1 ("[B]efore custom and usage can supplement or qualify an agreement, each party must know or have reason to know of that usage."); Restatement of Contracts (Second), § 220(1) ("An agreement is interpreted in accordance with a relevant usage if each party knew or had reason to know of the usage and neither party knew or had reason to know that the meaning attached by the other was inconsistent with the usage."). First American has argued and its witnesses have testified that it did not have a course of dealing or even a contract or relationship with Texas Capital.  It follows that a course of dealing could not affect the duties of the parties to the bailment contract.

While a course of dealing theory does not apply to the facts of this case, the related concept of "usage" *is* applicable.  *See* Restatement of Contracts (Second), § 222(1) ("A usage of trade is a usage having such regularity of observance in a  place, vocation, or trade as to justify an

---

[102] First American Title Insurance Co.'s (1) Reply In Further Support Of Motion For Partial Summary Judgment On Plaintiff's Claims Involving The National City Wires And (2) Response To Plaintiff's Cross-Motion For Partial Summary Judgment (D.I. 75) ("First American's Reply"), at 5.

[103] *See* Mooser Deposition at 17 (attached at Exhibit 4) (Q. Okay.  Did First American have a relationship with Texas Capital in 2008?  A. Not that I'm aware of.").

expectation that it will be observed with respect to a particular agreement.").  Texas Capital and

First American were both aware of the industry standard that funds received by wire in error

should only be returned to the originator—the party that sent the money.   Witnesses with

otherwise diverse interests have consistently recognized this standard, including First American's

office manager in 2008, Tammy Likes,[104] the former president of Prajna,[105] Ms. Phouthavong,[106]

and Texas Capital's witnesses.[107]   First American's internal training documents also establish

this standard.[108]  Thus, the parties were aware of the custom in the industry that funds wired in

error should be returned to their sender.  This Court has determined that, in the absence of bailor

instructions, this standard is also the default duty of a bailee.[109]  It should be considered an

additional term of the bailment contracts arising between Texas Capital and First American.

---

[104] Likes Deposition at 239-242 (attached at Exhibit 11) (stating wired funds should be returned to where they came from if there is no associated file).

[105] *See* November 10, 2010 deposition of Prajna's former president, Robert Lloyd ("Lloyd Deposition") at 194-197 (discussing First American's compliance with Ms. Phouthavong's requests for Texas Capital's funds: "I couldn't believe that that would be a practice that a title company would allow.  But knowing the title business – you asked the question was I shocked.  The answer is yes, I was shocked.  That – that did not stand like – sound like standard practice.").  Copies of the portions of the Lloyd Deposition referenced in this brief are attached and incorporated here as **Exhibit 36**.

[106] Phouthavong Deposition Day 2 at 15-16 (attached at Exhibit 14) (stating the "normal process" was to return funds to warehouse lender if loan was not going to close); *id.* at 236 ("As a title company, the more secure practice is to send that wire back to where it originated if it did not – if the loan was not closing.").

[107] *See* October 28, 2010  deposition of Texas Capital's Gary Ort ("Ort Deposition") at 15 ("That is industry precedent.  It – we receive wires all the time at the bank that are not able to be allocated, and they're always returned to the originating bank.  That's just industry standard, industry practice that it always be returned to the originating bank."); Robinson Deposition at 112-114 (attached at Exhibit) ("My expectation and what I considered to be standard practice was return the money where it came from. . . .   [I]t should always be that way. . . .   [G]eneral practice is to return the wire where it came from, always if it's not your wire.  That's the way.").  Copies of the portions of the Ort Deposition referenced in this brief are attached and incorporated here as **Exhibit 37**.

[108] *See* National Trust Accounting Policies And Procedures, (attached at Exhibit 3), at page 4 ("To reject or return as [sic] wire, follow these steps: a. Paste a copy of the *incoming wire* from iBanking into the body of your email.").

[109] *See Tex. Capital Bank, N.A.*, 2011 U.S. Dist. LEXIS 109672, at *13 ("A bailee has a duty to hold the bailed property and either return it to the bailor or dispose of it in accordance to the bailor's instruction.").

33

There is simply no evidence of a pattern of conduct between the parties to establish a course of dealing that would justify First American's forwarding of Texas Capital's funds to Prajna.  Because the parties understood the industry standard that mistaken wires should be returned to their sender, this is an additional basis to find that summary judgment should be granted in Texas Capital's favor.

**B.  First American Is Also Liable To Texas Capital For Converting The Wired Funds.**

Similarly, First American's acts and omissions described in this brief constitute a conversion of the $1.9 million.  The Court stated in its recent opinion and order granting Texas Capital's motion to add the conversion claim that "if the conversion claim stands, the central issue in its disposition will be the same issue identified in this Court's previous order: 'whether First American Title properly discharged its duties under the bailment by disposing of the funds according to Texas Capital's instructions.'" [110]  Thus, the same undisputed acts and omissions described in this brief that constitute the breach of the bailment contract also establish the conversion by First American.

Texas Capital hereby adopts its Reply In Support Of Its Motion For Leave To File Second Amended Complaint (D.I. 90), in which the applicable law for the conversion claim is discussed and the conversion claim is established.  As described there, First American is liable for conversion even if it simply made a mistake in sending the wired funds to Prajna.  In addition, First American's Rule 30(b)(6) witnesses recently testified that First American does in fact

---

[110] Opinion filed February 17, 2012, at 4 (D.I. 103).

receive a benefit from having funds deposited into its escrow accounts.[111]   Thus, First American

is liable to Texas Capital for converting the $1,914,648.44.

## VI. <u>CONCLUSION</u>

Texas Capital respectfully requests that the Court grant Texas Capital's Motion.   A

proposed order is tendered.

<div style="margin-left:50%">

Respectfully submitted,

/s/ Lee A. Webb
Lea Pauley Goff
Lee A. Webb
Matthew R. Lindblom
Stoll Keenon Ogden PLLC
2000 PNC Plaza
500 West Jefferson Street
Louisville, Kentucky  40202-2828
Telephone: (502) 333-6000
Fax: (502) 333-6099

*Counsel for Plaintiffs Texas Capital Bank,
N.A., Liberty Mutual Insurance Europe
Limited trading as Liberty International
Underwriters, and Certain Underwriters at
Lloyd's London who are members of
Syndicate Nos. 4444, 2003 and 4000
subscribing to Bond No. FA054730g00*

</div>

792303

---

[111]   McKay 30(b)(6) Deposition at 206 (attached at Exhibit 12) (stating First American receives earned interest from First American Trust, the bank that held the First American Louisville office's escrow account in 2008); Mooser 30(b)(6) Deposition at 42 (attached at Exhibit 4) (Q. . . "So, again, talking about the funds being wired into those accounts, there is some benefit to First American having those there, correct?  A.  Yes.  Q.  Okay. And the funds that are wired into those accounts, they go to pay the – the service fees that First American collects for closing a loan, correct?  A.  Yes.").  Of course, as made clear in Texas Capital's briefs supporting the motion to add the conversion claim, perhaps the most significant benefit to First American in handling the converted funds was that it was furthering First American's business to do so and kept its customer, Prajna, happy with First American's services.